The State of Ohio, Appellee, *v.* McDade, Appellant.

(No. 5185—Decided May 25, 1959.)

*Mr. Harry Friberg*, prosecuting attorney, and *Mr. Benjamin H. Fisher*, for appellee.
*Mr. Morris J. Britz*, for appellant.

Deeds, J. This is an appeal by the defendant from a judgment and sentence to the penitentiary by the Court of Common Pleas of Lucas County. The defendant was tried and found guilty by a jury, on an indictment charging a violation of Section 2901.23, Revised Code, which section provides as follows:

"No person shall maliciously shoot, stab, cut, or shoot at another person with intent to kill, wound, or maim such person.

"Whoever violates this section shall be imprisoned not less than one nor more than twenty years."

Defendant assigns errors as follows:

"First Assignment of error: The Court of Common Pleas of Lucas County, Ohio, erred in refusing to instruct the jury on the question of self-defense as requested by the attorney for the appellant herein.

"Second Assignment of error: The court erred by instructing the jury that the defendant's attorney had requested

a charge of self-defense and that the court had refused said charge.

"Third Assignment of error: The verdict was against the manifest weight of the evidence and not sustained by sufficient evidence."

The evidence in the record discloses, in part, that the defendant was standing or seated at the bar in the "Flame" tavern, engaged in drinking a bottle of beer; that two brothers by the name of Allen entered the tavern; that the brothers were acquainted with defendant; that the defendant offered to buy the brothers a drink; that drinks of whiskey were served to the brothers; that one Byrd, a complaining witness, without invitation, came to the bar from a table where he had been seated and drank one of the glasses of whiskey which had been served one of the brothers; that thereafter he picked up and was in the act of drinking the remaining glass of whiskey, whereupon defendant objected and a tussle or brawl ensued, during which it is charged the defendant cut Byrd and another man with a pocket knife.

For the purpose of making a determination of defendant's assignment of errors numbered one and two, we will quote a portion of the testimony considered relevant to the defense of self-defense.

From the testimony of one of the brothers we find the following:

"Q. You say McDade offered you a drink? A. Yes, he did.

"Q. What did you say? A. Well, I said, yes, I will have the same thing he is drinking.

"Q. What was he drinking? A. Beer.

"Q. Did you have a beer? A. No, he said to get a shot if you want it, so I had a shot of whiskey.

"Q. Do you remember the brand of whiskey? A. No.

"Q. What was your brother doing while he was there? A. He was with me. We both had the same. He offered us both.

"Q. Were you standing next to your brother? A. Yes.

"Q. Where was McDade? A. He was by the bar.

"Q. Did you drink your drink? A. I didn't get to drink it all. I drank half.

"Q. While you were there drinking this drink, tell us what

happened? A. Another fellow after I had taken a drink, he sat down and taken it from me.

"Q. Who did that? A. A boy by the name of Byrd.

"Q. And he did what with the drink? A. He drank it.

"Q. Your drink? A. Yes.

"Q. Then what happened? A. Mr. McDade, L. C. explained to him he bought the drink for me and intended me to have the drink and he didn't appreciate having it taken from me. One word led to another and this fellow went to his pocket, nasty words were used.

"Q. Between who? A. This fellow Byrd.

"Q. And Mr. McDade? A. Yes.

"Q. Then did the fight start? A. It wasn't exactly a fight, it was more of a tussle.

"Q. Who struck the first blow? A. I didn't get to see that because the fellow went in his pocket and I didn't know if he was going for a knife.

"Q. Then a tussle ensued? A. Yes.

"Q. Then what happened? A. They was wrestling.

"Q. Who? A. L. C. and Byrd.

"Q. Then what happened? A. They fell on the floor, some fellow, I don't know his name, I seen him yesterday, a big fellow, had on a blue suit yesterday.

"Q. Was his name Miller? A. I don't know his name.

"Q. Did he testify yesterday. A. He come in here.

"Q. What color suit did he have on? A. Blue.

"Q. What did he do? A. He jumped in there.

"Q. In where? A. In the fight and they were falling all over the floor.

"Q. Was the big fellow falling? A. He never fell on the floor.

"Q. Did anyone else get in the tussle? A. There was so many fellows.

"Q. Did you see any of the fellows yesterday in the court room that were in the tussle? A. Yes.

"Q. Which one? A. Smith.

"Q. Was he in the tussle? A. He had a chair.

"Q. What was he doing with the chair? A. He hit Mr. McDade in the back.

"Q. With the chair? A. With the chair.

"Q. You saw that? A. I seen that."

The other brother testified in part as follows:

"Q. When you came into the bar, did you see Mr. McDade? A. Yes.

"Q. Where was he? A. At the front of the bar.

"Q. Did you talk to him? A. Yes, I spoke to him and he spoke to me and asked did I want a drink.

"Q. What was he doing? A. Sitting at the bar.

"Q. Was he drinking? A. He had a bottle of beer.

"Q. Did you have anything to drink? A. Yes.

"Q. What did you have to drink? A. I got some whiskey.

"Q. Who bought it for you? A. He bought it.

"Q. Did he pay for it? A. Yes.

"Q. Did you drink the whiskey? A. Yes, I did.

"Q. Drink all of it? A. No, I didn't get a chance to drink all of it.

"Q. How much of it did you drink? A. About half of it, I would say.

"Q. Why didn't you finish it? A. That's when the trouble started. A fellow came over there and he wanted his glass of whiskey.

"Q. Whose glass of whiskey did he want? A. My glass of whiskey. It was setting between me and my brother.

"Q. Who was the fellow? A. Byrd.

"Q. Do you know him? A. I went to Junior High School with him.

"Q. How long have you known Byrd? A. About seven or eight years.

"Q. When he attempted to get this whiskey, what happened? A. McDade told him he bought the whiskey and he didn't want him to interfere.

"Q. Did McDade buy each of you a drink? A. Yes.

"Q. Where were you standing with reference to your brother? A. McDade was on the end, my brother next to him, and then I.

"Q. And these drinks were in front of you? A. Yes.

"Q. Was McDade next to you? A. No, he was right by my brother. We was standing together, all three of us were right on the end of the bar.

"Q. Did this man Byrd drink any of this whiskey? A. He got ready to drink some whiskey and McDade told him to put the glass down, he didn't buy the whiskey for him and one word led to another.

"Q. Then what? A. Byrd reached for his back pocket, put his hand in his pocket.

"Q. Reached in his back pocket for what? A. I don't know unless it would be a knife.

"Q. Who did that? A. Byrd.

"Q. Is that common, you reach in your pocket for a knife?

"Mr. Fisher: Objection.

"The Court: Sustained, the jury will disregard this question.

"Q. Everything you are telling happened at this particular place at this particular time? A. That's right.

"Q. When he put his hand in his pocket, what happened? A. McDade grabbed him and he grabbed McDade, and they fell on the floor by the telephone booth. They were wrestling on the floor then about four or five fellows came over there and one of them hit a chair over his head.

"Q. Whose head? A. McDade.

"Q. Who had the chair? A. Billy Smith.

"Q. Do you know Billy Smith? A. Yes.

"Q. How long have you known him? A. I would say a year or two.

"Q. Was there anyone else involved in this fight? A. Yes, four or five more fellows.

"Q. Were any of the other fellows down on the ground? A. There were so many people around. It was more or less a syndicate like.

"Mr. Fisher: Objection.

"The Court: Sustained. The jury is not interested in your opinions or conclusions but only state just what you saw and observed. The jury will disregard any reference to the word syndicate.

"Q. Did you see Billy Smith there? A. Yes.

"Q. What did you see him do? A. Seen him with the chair over his head trying to hit McDade.

"Q. Where was Mr. Byrd? A. McDade and Byrd was on the floor together.

"Q. Was anyone else on the floor with them? A. Another fellow, I don't know his name.

"Q. Did you see him here yesterday? A. Yes.

"Q. What color suit did he have? A. Blue suit.

"Q. A tall heavy set fellow? A. Yes.

"Q. Do you know a fellow by the name of Frank Woodward? A. Yes.

"Q. Did you see him there? A. Yes.

"Q. What was he doing? A. He was trying to help jump on McDade.

"* * *.

"Q. Who took the chair? A. Well, Billy Smith was one.

"Q. Was Billy Smith at this table? A. Yes.

"Q. Was Mr. Woodward at this table? A. Yes.

"Q. Was Mr. Miller at the table? A. No, he was standing by the bar.

"Q. And Byrd was standing next to whom? A. To McDade.

"Q. When the fight started, what did Mr. Miller do? A. When Byrd and McDade fell to the floor, Miller got over and was trying to help Byrd."

On cross-examination, the witness testified in part as follows:

"Q. So you want us to believe the thing that caused this tussling and fight was the fact that Byrd took your brother's whiskey and took your whiskey? A. That's right."

The evidence in the record is undisputed that Byrd provoked the altercation and to that extent was the aggressor. In our view, the circumstances warranted an inference that a number of Byrd's companions joined in making an attack upon the defendant, including the attack with a chair, which evidence, concerning the use of a chair, is also not in dispute.

It is our opinion that the testimony of the brothers to the effect that Byrd reached for his pocket and that they were impressed that he intended to use a knife, the number of persons involved, and the assault with a chair, were relevant for consideration by the jury, in determining whether the defendant would be justified in the use of his pocketknife in defending himself from great bodily harm.

The record discloses that when the arguments of counsel

to the jury had been concluded, counsel for the defendant requested the court to instruct the jury on the issue of self-defense, which request and the response of the court are as follows:

"Mr. Britz: May we approach the bench?"

Thereupon the following proceedings were had at the bench:

"Mr. Britz: Counsel for the defendant hereby requests an instruction on self-defense on behalf of the defendant.

"The Court: As I indicated to you before during closing arguments, I was not going to charge on self-defense because in my opinion self-defense is an affirmative defense which must be interposed by the defendant on behalf of himself. The defendant having failed to assert self-defense, there will be no charge given on same."

In the general charge of the court to the jury, the trial judge made the following statement concerning self-defense:

"The defendant in this case has requested the court to charge this jury on the law of self-defense. The law of self-defense is a defense which the defendant interposes on behalf of himself and in law is an affirmative defense, the burden of which is upon the defendant to prove by a preponderance of the evidence. The defendant in this case having failed to assert self-defense, the court has refused the request of the defendant to charge in that regard."

Section 2945.10, Revised Code, provides in part as follows:

"(E) When the evidence is concluded, either party may request instructions to the jury on the points of law, which instructions shall be reduced to writing if either party requests it."

Section 2945.11, Revised Code, provides in part that:

"In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict. The court must also inform the jury that the jury is the exclusive judge of all questions of fact."

The defendant did not testify at the trial of the case in the Court of Common Pleas.

It appears that the trial judge had the impression that the failure of the defendant to testify was an indication that de-

fendant had, in effect, waived or was precluded from interposing the defense of self-defense.

In *Graham* v. *State*, 98 Ohio St., 77, 120 N. E., 232, in the opinion by the court, at page 81, it is stated concerning the duty of the court to charge the right of self-defense:

"In its general charge to the jury the court gave the defendant the benefit of the law relating to self-defense. It is now claimed that in this the court erred for the reason that the defendant denied the act of firing the shot that killed Latona. It is therefore claimed that the injection of the question of self-defense impliedly admitted that the defendant may have fired the shot that killed the decedent, and was therefore prejudicial error. While it is true the defendant denied the killing, several of the state's witnesses gave testimony tending to show that he fired the shots that killed the decedent. It also appears, both from the cross-examination of the state's witnesses and from the defendant's witnesses, that whatever was done by Graham and his associates on that occasion was done in the lawful defense of their persons. Under that phase of the case, it became the duty of the court to charge the right of self-defense. When the defendant entered his plea of not guilty, he could avail himself of all the defenses which the evidence disclosed. It would be perfectly proper for him to say (*a*) I did not fire the shot; (*b*) Whatever I did, I did in my own self-defense. The mere fact that defendant does not admit the killing does not preclude him from this right. Indeed, the defendant may not take the stand at all or offer any evidence in defense. The evidence of self-defense may come wholly from the state; but whether the evidence comes from the defense, or from the state supporting his lawful right of self-defense, it is the duty of the court to charge that feature of the law. The rule is stated as follows in 13 Ruling Case Law, page 813: 'If the defendant denies the killing and there is no evidence adduced by either party which tends to show that the killing might have been in self-defense, although other evidence shows quite conclusively that the defendant committed the crime, it is not the duty of the court to instruct as to self-defense; but if the evidence tends to raise the issue of self-defense although the defendant denies the killing, it seems that an instruction based on the theory of self-defense is proper and

should be given.' That the instruction relating to self-defense was properly given is supported by the overwhelming weight of authority. *State* v. *Jackett*, 81 Kans., 168; *Frazier* v. *Commonwealth*, 114 S. W., 268, and *State* v. *Sloan*, 149 Iowa, 469.''

It is our conclusion, in the case before us, that it was the duty of the trial court to charge the jury with respect to the right of self-defense. *Industrial Fibre Co.* v. *State*, 31 Ohio App., 347, 166 N. E., 418; *Ickes* v. *State*, 42 Ohio App., 446, 182 N. E., 49; *Felsman* v. *State*, 45 Ohio App., 428, 187 N E., 201; *State* v. *Collins*, 94 Ohio App., 401, 115 N. E. (2d), 844; *Chidester* v. *State*, 25 Ohio St., 433; *Grossweiler* v. *State*, 113 Ohio St., 46 (see opinion, p. 48), 148 N. E., 89; *Fouts* v. *State*, 113 Ohio St., 450 (see opinion, p. 464), 149 N. E., 551.

We determine that the statement by the trial court in the general charge, referring to its refusal of the request of the defendant to charge on the law of self-defense, was improper and prejudicially erroneous.

For the reasons stated, the judgment of the Court of Common Pleas is reversed and the cause remanded for a new trial.

*Judgment reversed.*

Fess, P. J., and Smith, J., concur.