[Cite as *State v. Kerns*, 2021-Ohio-127.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. Earle E. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2020 CA 00011 |
| CHAD A. KERENS | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:       Criminal appeal from the Fairfield County
                                                         Court of Common Pleas, Case No.,2019
                                                         CR 00199

JUDGMENT:                                     Affirmed

DATE OF JUDGMENT ENTRY:       January 20, 2021

APPEARANCES:

For Plaintiff-Appellee                         For Defendant-Appellant

R. KYLE WITT                                    ANDREW SANDERSON
Fairfield County Prosecutor               BURKETT & SANDERSON
BY: BRIAN T. WALTZ                        738 East Main Street
Assistant Prosecutor                         Lancaster, OH 43130
239 West Main Street, Ste. 101
Lancaster, OH 43130

*Gwin, P.J.*

{¶1}    Defendant-appellant Chad A. Kerens ["Kerens"] appeals his murder conviction after a jury trial in the Fairfield County Court of Common Pleas.

*Facts and Procedural History*

{¶2}    At 10:03 a.m. on April 8, 2019 Kerens clocks out from his job at Tim Horton's. 3T. at 518[1]; State's Exhibit 24.  At 10:04 a.m. surveillance video captures Kerens leaving the building and walking to the area of his car. 3T. at 502-503; State's Exhibit 26.   At 10:07 a.m. surveillance video captures Kerens's car en route to his apartment. 3T. at 509; State's Exhibit 5. Kerens would later tell the police in a taped interview that he had left work on a break to go to his apartment to get his Insulin and to see if Kassaundra Phillips had gotten the laptop he said that he would lend her. 3T. at 406.

{¶3}    At 10:07 a.m. on April 8, 2019, Victor White clocks out from his job at Tim Horton's. 3T. at 518 -519.  Surveillance video from Tim Horton's shows White walking out of the kitchen and out the back door of Tim Horton's. 2T. at 372; State's Exhibit 23.  At this time, Amanda Grey the assistant manager of Tim Horton's was on break smoking a cigarette in her car in the parking lot of Tim Horton's. 2T. at 361.   As White is passing by her car, Grey hears White's cell phone ring. 2T. at 363. Because White had the phone on speaker, Grey was able to hear the voice of Kerens on the phone asking the whereabouts of White. 2T. at 365. White told Kerens that he was at work getting ready to leave. 2T. at 366. Grey then overheard Kerens ask, "Are you on your way?" 2T. at 366. White responded, "Yes." 2T. at 366.  White then approached Grey and told her that he would

---

[1] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

see her the next day. 2T. at 367. White entered his vehicle and drove away. 2T. at 367. Surveillance video from a nearby gas station shows White's white Chevrolet 300 heading in the direction of Kerens's apartment at 10:14 a.m. 3T. at 510; State's Exhibit 25.

{¶4}    On April 8, 2019, Kassaundra Phillips was living with the mother of Kerens, Sandra Travis. 2T. at 150. Phillips knew Kerens because Kerens was the brother of Phillips's ex- fiancé. 2T. at 150.

{¶5}    At 10:18 a.m. on April 8, 2019, Kerens called Kassaundra Phillips. 2T. at 154; 190. State's Exhibit 8-B[2]. The call unexpectedly ended after Kerens asked Phillips what she was doing.   At 10:20 a.m. Phillips texted Kerens and asked if he had meant to hang up. 2T. at 154; 193; 210.   Kerens called Phillips back to tell her that he had arranged for Phillips to speak to someone concerning getting her job back at Tim Horton's and that Phillips needed to go there at once. 2T. at 155 State's Exhibit 8-B.  Kerens again calls Phillips and now tells her to come to his apartment instead of going to Tim Horton's. 2T. at 156; 192; State's Exhibit 8-B. At 10:31 a.m. Kerens again calls Phillips. 2T. at 192; State's Exhibit 8-B. Kerens tells Phillips something about being robbed and that if she doesn't get there he is going to prison for the rest of his life. 2T. at 157; 214. Phillips, upon seeing a police officer in the area, texted Kerens to ask if he had already called the police. 2T. at 157; 194. Phillips did not receive a reply. 2T. at 158.

{¶6}    As Phillips was pulling into the parking lot near Kerens's apartment building, Kerens pokes his head out from the doorway and tells her, "Kassie get the F in here." 2T. at 159. Phillips parks her car and entered Kerens's apartment. 2T. at 159.  Immediately, Phillips sees blood everywhere. 2T. at 160. Kerens begins telling Phillips that he needed

---

[2] State's Exhibit 8-B is the call log extracted from the cell phone of Kassaundra Phillips. 2T. at 187. The parties stipulated to the admission of State's Exhibits 8-A; 8-B and 8-C. 2T. at 195-196.

her to say that she was being raped, that way he could get self-defense. 2T. at 160. Kerens tells Phillips that if she does not say that she was being raped, Kerens would go to prison for the rest of his life. 2T. at 161. Kerens then rips Phillips shirt, soaked up some of the decedent's blood with a towel and began smearing the blood onto Phillips' clothing and skin. 2T. at 161.[3] Kerens "smacked" Phillips a few times because he needed to make her look roughed up. 2T. at 162. Kerens then told Phillip that she needed to have the victim's skin underneath her fingernails, so she needed to scratch the victim. 2T. at 163. Phillips dragged her fingernails along White's skin. 2T. at 163. Kerens told Phillips she needed to get into the shower because, Kerens said, "that's what people that got raped do, they get into the shower." 2T. at 162. Phillips entered the shower but did not fully undress. She also turned the shower head toward the wall and did not shower off. 2T. at 166. Kerens entered the bathroom with Phillips's cell phone and directed her to call Kerens's mother and tell her that he had been stabbed but he was o.k. 2T. at 165. While in the shower, Phillips overheard Kerens call his wife, Amanda. 2T. at 166.

{¶7} On April 8, 2019 at 3:43 a.m. Amanda Kerens clocked into work at Tim Horton's. 3T. at 519- 520; State's Exhibit 28. Call logs and text message logs from Amanda Kerens's cell phone show that Kerens had called his wife at 10:34 a.m. 3T. at 479. That call went unanswered. A second call was made by Kerens to his wife at 10:39 a.m. 3T. at 479. That call also went unanswered by Amanda. 3T. at 479. A third call from Kerens to his wife made at 10:49 a.m. also went unanswered. 3T. at 480. Amanda Kerens clocked out from her job at Tim Horton's at 10:45 a.m. 3T. at 518; State's Exhibit 28.

---

[3] Phillips was unable to identify the victim at that time. 2T. at 161; 163.

Surveillance video from a nearby business, American Court Services, showed Amanda Kerens arriving home at 10:48 a.m. 3T. at 504; 506; 509-510.

{¶8} From the shower, Phillips heard Amanda arrive and begin to scream, "What the F. What the F. Oh, my God." 2T. at 167. Phillips leaves the shower to see Kerens on the floor telling his wife that Phillips had been raped. 2T. at 168. Kerens was acting as though he was in pain, something he had not done up to that point. 2T. at 168-169.

{¶9} At 10:51 a.m. Amanda Kerens calls 9-1-1. 2T. at 169; 3T. at 480. Amanda helped Kerens out of the apartment. 5T. at 908. Kerens gave Amanda his cell phone and wallet at the scene. 5T. at 908-909.

{¶10} On the morning of April 8, 2019, Officer Mel Leckrone of the Lancaster Police Department was in the vicinity of Kerens's apartment serving subpoenas. 2T. at 81-82. At approximately 10:43 a.m. Officer Leckrone was in route to an East Chestnut street address to serve a subpoena. 2T. at 82. While there, a dispatch came in that possibly two people that had been stabbed at 112 West Walnut Street. 2T. at 83. Officer Leckrone responded and arrived at the address in approximately ninety seconds. 2T. at 83. Officer Leckrone was equipped with an Axon body camera. 2T. at 78.

{¶11} Upon his arrival, Officer Leckrone's body cam shows a hectic scene outside the apartment. 2T. at 85; State's Exhibit 1. An individual is seen administering first aid to Kerens. 2T. at 85. Also seen in the video is Kassaundra Phillips. 2T. at 85. After entering the apartment, Officer Leckrone sees the body of Victor White laying on the kitchen floor and blood covering the scene. 2T. at 86. Officer Leckrone observed multiple stab wounds to White's head, neck, cheek and body. 2T. at 86. Fire and EMS personnel are seen arriving on the body camera video footage.

{¶12} Becky King is the manager of the apartment complex were the Kerens' lived. On April 8, 2019, upon learning that something happened, King went to the apartment. 2T. at 98. Amanda Kerens opened the door. As she entered, King observed Amanda on the phone and Kerens on his knees in the bathroom doorway. 2T. at 100. Kerens told King that there was a rape going on. 2T. at 101. King assisted in getting Kerens outside. 2T. at 101. Kerens was not overly bloody. King noticed a "couple of straight marks on [Kerens's] gut area." 2T. at 105. Kerens had told King that he had been stabbed. 2T. at 105. However, King noted that "it really wasn't bloody. I was surprised. There was some fluid, but it wasn't terribly bloody." 2T. at 105. The wounds were not actively bleeding very much. 2T. at 105. King observed Kerens and Amanda talking quietly. 2T. at 105-106.

{¶13} Jonathan Bruning from the Lancaster Fire Department had been dispatched to the scene at approximately 10:53 a.m. on April 8, 2019. 2T. at 111. Upon arrival at Kerens's apartment Bruning observed a male lying on the ground on his back who had multiple puncture marks to his abdomen that were not bleeding. 2T. at 113. Bruning motioned to another unit to attend to this man, while Bruning entered inside the apartment. 2T. at 113. Inside, Bruning saw a man lying on his side in a pool of blood. Medics attempted to resuscitate White. Bruning was able to observe two stab wounds where White's fatty tissue or intestines had popped out from White's body. 2T. at 117-118. Bruning also noted a fixed blade knife at White's ankle or lower leg area. 2T. at 120; State's Exhibit 10-A.

{¶14} David Jenkins a firefighter/paramedic with the Lancaster Fire department attended to Kerens on the scene. 2T. at 128; 131. Jenkins noted that Kerens had a few

puncture wounds. 2T. at 131. The wounds were treated with, in effect, a giant band aid. 2T. at 131-132.  Kerens told Jenkins that he had come home, found him on top of her, and when he pulled him off, he stabbed him. 2T. at 134.

{¶15}  Phillips eventually spoke to Officer Shane McGee while she was at the apartment. 2T. at 139; 171. She spoke while seated in the back of a police cruiser. 2T. at 142; 171-172. Phillips told the officer that, "I couldn't do it, I couldn't lie, I couldn't tell a lie." 2T. at 143; 172. She then told the officer what had happened.  She further told a detective what Kerens had asked her to do. 2T. at 172.  Phillips denied that she was ever attacked or raped by Victor White. 2T. at 172. Officer McGee was equipped with an Axon body camera. State's Exhibit 3.

{¶16}  Detective Kurt Humbert of the Lancaster Police Department asked officers to transport Phillips from the scene to the Lancaster Police Department so that he could interview her. 3T. at 383-384.   Detective Humbert took pictures of Phillips, and what she had been wearing. 3T. at 384. Detective Humbert secured Phillips cell phone for further examination. 3T. at 398- 402.

{¶17}   At 6:12 p.m. on April 8, 2019 Detective Humbert interviewed Kerens. 3T. at 406; 414.  Kerens told Detective Humbert that he left work to go home and get some insulin and to see if Phillips had retrieved a laptop that he had allowed her to use. 3T. at 407.  When he got out of his car, Kerens said he heard screaming and yelling, "Get off me. Stop it." 3T. at 407. Kerens said that he had to unlock the apartment door. 3T. at 420-421. He unlocked the apartment door and, as he went inside, he heard the screams again and saw Phillips on the couch covered in blood and her clothes ripped off.  3T. at 407. Kerens told Detective Humbert that "Vic" was attempting to rape Phillips. 3T. at 407.

Kerens claimed that he then grabbed White's shoulder and pulled him off Phillips in an attempt to save her. 3T. at 407. Kerens claimed that White must have already had a knife in his hand and that White stabbed Kerens. 3T. at 407-408. Kerens asked White what was going on, to which White said, "F-you" and stabbed Kerens again. 3T. at 408. Kerens told Detective Humbert that he and White "began tussling and tussling." 3T. at 408. Next thing he knew, he and White were on the kitchen floor and there was blood all over the kitchen. 3T. at 408. Kerens then called his wife Amanda and told her to get home. 3T. at 408. Even after Detective Humbert confronted Kerens with the fact that he knew that is not what happened, Kerens maintained the rape scenario had occurred. 3T. at 409; 427. He claimed that the police were picking on him or accusing him of lying when he, in fact, was telling the truth. 3T. at 409. Kerens then stated that if they were not going to believe them he was not going to talk anymore. Almost immediately, Kerens reinitiated the dialogue. 3T. at 410.

{¶18} When asked by Detective Humbert if something else had happened, Kerens repeatedly said, "You tell me how that goes." 3T. at 411. Kerens changed his story. He stated, "You tell me how a robbery goes. Basically, I had $480 in my wallet and now I have none, so you tell me how that works." 3T. at 411. When Detective Humbert declined, Kerens said both the rape and the robbery had occurred. 4T. at 411; 429. Kerens once again stated he was not going to talk any further. 3T. at 411. Detective Humbert testified that Kerens seemingly also had mentioned that there was a third scenario; however, Kerens did not provide any details about this scenario. 3T. at 412; 429. Kerens's interview with Detective Humbert was recorded and played during Kerens's jury trial. 3T. at 412; State's Exhibit 38. Detective Humbert testified that $480 was not found on either White

or Phillips. 3T. at 430. The coroner testified that White had $54 in his wallet which was still in his pants pocket when the body was transported to the coroner's office. 4T. at 644-646.

{¶19} After the officers had left the interview room, Kerens called out for Phillips to tell the truth. 3T. at 431.

{¶20} Detective Humbert also reviewed calls from Kerens to his wife recorded while Kerens was in jail. 3T. at 446; State's Exhibit 31. On April 8, 2019 at 8:49 p.m. Kerens called Amanda and told her that he needs "her" to tell the truth or he is going to prison for the rest of his life because when he says the truth it would not fly. 3T. at 450. In another call, Amanda asks Kerens for the code to his cell phone. 3T. at 455. Kerens did not give her the code. The day after White's death, Amanda asks Kerens for the code to the Xbox. 3T. at 456. Kerens tells Amanda, "You were supposed to get rid of it." 3T. at 456. Kerens in another call tells his wife that he cannot tell her what happened over the phone. 3T. at 457. Kerens tells his wife that if he were to be released on bond, he would flee. 3T. at 458. Kerens told his mother in a phone call from the jail that he had no proof of self-defense without Phillips testimony about a rape. 3T. at 459.

{¶21} Detective Humbert told Amanda that he was interested in recovering Kerens's cell phone. 3T. at 472. Amanda initially told Detective Humbert that she had gotten rid of the phone. 3T. at 472. After being informed that it could be impeding the investigation or obstructing the investigation, Amanda directed Detective Humbert to her mother's home where Kerens's cell phone had been taken. 3T. at 473. Law enforcement was unable to unlock Kerens's phone to extract data from it because the phone was encrypted down to the chip. 3T. at 481-482.

{¶22} Dr. Jeffrey Lee, who performed the autopsy of Victor White testified regarding the nature of his injuries and cause of death. He stated that there were approximately 46 separate knife wounds on Victor White. 4T. at 700. Of those, at least 9 of them were to the back. 4T. at 708-709. Victor White also had 4 broken ribs from the attack. 4T. at 712. Additionally, all of the knife wounds were done while Victor was still alive. 4T. at 676. Dr. Lee opined that the cause of death was a loss of blood.

{¶23} Kerens offered the testimony of three-character witnesses. Charles Kuhn testified that he was of the opinion that Victor White had been a violent character. 5T. at 889. Kuhn also testified about his 3 separate prior convictions for theft and his felony convictions for theft and tampering with evidence. 5T. at 889. Justin Bruney testified that he was of the opinion that Victor White had been a violent character. 5T. at 892. He also testified regarding his prior felony for trafficking in drugs, another felony for possession of drugs, another felony for trafficking in drugs, and that he was Kerens's cousin. 5T. at 893. Joshua Landis testified that Victor White had a reputation for being violent. 5T at 896. He also testified regarding his prior theft conviction, his other prior theft and receiving stolen property convictions, and his prior felony conviction for aggravated possession of drugs. 5T. at 897. He also testified that he was Kerens's brother. 5T. at 897.

{¶24} Amanda Kerens testified that the Dewalt brand folding knife that was claimed to be the knife that Victor White allegedly used was gifted by Kerens to Victor White the prior Christmas. 5T. at 901. Amanda further testified that the Gerber fixed blade knife belonged to her husband. 5T. at 900. She further testified that Kerens frequently carried the Gerber knife. 5T. at 900. She also admitting to lying to police during the course

of the investigation. 5T. at 912. Amanda also testified about her three separate felony convictions for theft, possession of heroin, and failure to appear. 5T. at 916.

{¶25} As a rebuttal witness to Amanda Kerens's testimony, the state called Sherry Hettinger. She was Victor White's fiancée and had been with him for approximately 8 years. 5T. at 930. She testified that, contrary to what Ms. Kerens stated, Victor White did not own or carry any knifes and that she had specifically never seen him in possession of the Dewalt knife. 5T. at 931-932.

{¶26} On April 18, 2019, an indictment was filed in the Fairfield County Common Pleas Court charging Kerens in a three-count indictment with murder in violation of R.C. 2903.02(A) and two counts of Tampering with Evidence in violation of R.C. 2921.12(A)(1) and / or R.C. 2921.12(A)(2). 5T. at 1011.

{¶27} Following the presentation of evidence, the jury returned a verdict of Guilty on the charges contained in the indictment. The trial court then proceeded to sentencing.

*Assignments of Error*

{¶28} Kerens raises three Assignments of Error,

{¶29} "I. THE TRIAL COURT COMMITTED HARMFUL ERROR IN FAILING TO PROPERLY INSTRUCT THE JURY REGARDING SELF-DEFENSE DURING THE PROCEEDINGS BELOW.

{¶30} "II. THE CONVICTION OF THE DEFENDANT-APPELLANT ON COUNT ONE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED BELOW.

{¶31} "III. THE DEFENDANT-APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL HEREIN."

I.

{¶32} In his First Assignment of Error, Kerens argues that even though not requested and, further, even though he did not object during his jury trial, the trial court committed plain error by failing to instruct the jury, "a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force." R.C. 2901.05(B)(2). [Appellant's Brief at 6-7].

**Standard of Appellate Review.**

{¶33}  In *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) the United States Supreme Court held that because the failure to properly instruct the jury is not in most instances structural error, the harmless-error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 applies to a failure to properly instruct the jury, for it does not necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

{¶34}  Crim.R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. In order to find plain error under Crim.R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise.  Id. at paragraph two of the syllabus. The

defendant bears the burden of demonstrating that a plain error affected his substantial rights. *United States v. Olano*, 507 U.S. at 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *State v. Perry*, 101 Ohio St.3d 118, 120, 802 N.E.2d 643, 646 (2004). "Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to 'prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. *Perry, supra*, at 118, 802 N.E.2d at 646.

{¶35}   An erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Cunningham*, 105 Ohio St.3d 197, 824 N.E.2d 504, 2004-Ohio-7007, ¶ 56. *See, also, State v. Adams,* 62 Ohio St.2d 151, 154, 404 N.E.2d 144 (1980) (holding that a trial court's failure to specifically charge the jury on every element of an offense is not per se plain error, but could result in plain error if the failure substantially prejudiced the defendant). Appellate courts notice plain error "'with the utmost caution, under exceptional circumstances [,] and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**Issue for Appellate Review**: *Whether the trial court committed a manifest miscarriage of justice by failing to specifically instruct the jury that they must presume Kerens acted in self-defense.*

{¶36}   R.C. 2901.05 provides in relevant part,

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense *other than self-defense, defense of another, or defense of the accused's residence as described in division (B)(1) of this section,* is upon the accused*.*

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, *the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.*

(2) Subject to division (B)(3) of this section, *a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.*

(3) The presumption set forth in division (B)(2) of this section *does not apply if either of the following is true:*

(a) The person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.

(b) The person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.

(4) *The presumption set forth in division (B)(2) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt as described in divisions (A) and (B)(1) of this section.*

Emphasis added.

{¶37} In the case at bar, the trial court instructed the jury, in relevant part,

Concerning self-defense. The Defendant is asserting a claim of self-defense.

The Defendant is allowed to use deadly force in self-defense. Evidence was presented relating to the Defendant's claim that the Defendant used deadly force in self-defense. The State must prove beyond a reasonable doubt that the Defendant did not use deadly force in self-defense.

Self-defense applies when:

(A) The Defendant was not at fault in creating the situation giving rise

to the death of Victor L. White; and (B) the Defendant had reasonable

grounds to believe and an honest belief, even if mistaken, that he was in

imminent danger of death or great bodily harm; and (C) the Defendant did

not violate any duty to retreat of escape to avoid the danger; and (D) the

Defendant used reasonable force.

Self-defense does not apply to this case if the State proves beyond

a reasonable doubt that any one of the above four conditions did not apply.

* * *

A person who is lawfully in his residence has no duty to retreat before

using deadly force in self-defense.

5T. at 1007-1010.

{¶38} The trial court in the case at bar instructed the jury that because Kerens was in his home he had no duty to retreat before using deadly force in self-defense. The jury was further instructed that the state had the burden to prove beyond a reasonable doubt that Kerens had not acted in self-defense.

{¶39} Although Kerens presented evidence tending to demonstrate White's violent nature, no evidence was presented that Kerens himself was aware of any violent propensity of White. The evidence established that Kerens had invited White to Kerens's apartment the morning of the offense.

{¶40} Even presuming that Kerens was acting in self-defense in accordance with R.C. 2901.05(B)(2), the state was required to disprove self-defense by proving beyond a reasonable doubt that Kerens (1) was at fault in creating the situation giving rise to the

affray; or (2) Kerens did not have a bona fide belief that he was in imminent danger of death or great bodily harm; and Kerens used reasonable force. *Cf. State v. Barnes*, 94 Ohio St.3d 21, 24, 2002–Ohio–68, 759 N.E.2d 1240, *citing State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755(1979). By finding Kerens guilty the jury found that the state met its burden of proving beyond a reasonable doubt the Kerens did not act in self-defense.

{¶41} We decline to find plain error because in the case at bar a manifest miscarriage of justice did not occur. Even had the jury had been instructed that Kerens was presumed to have acted in self-defense, the jury was instructed and found in the case at bar that the state had rebutted any finding that Kerens had acted in self-defense beyond a reasonable doubt. We find the trial court's instruction did not rise to level of plain error because the outcome of the trial would not have been otherwise had the presumption instruction been given. *See, State v. Colston,* 5th Dist. Muskingum No. CT2019-0076, 2020-Ohio-3879, ¶ 65; *State v. Broucker*, 5th Dist. Stark No. 2007CA00315, 2008-Ohio-2946, ¶ 38.

{¶42} Kerens's First Assignment of Error is overruled.

II.

{¶43} In his Second Assignment of Error, Kerens maintains that his conviction for murder is against the manifest weight of the evidence.[4]

**Standard of Appellate Review – Manifest Weight.**

{¶44} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the

---

[4] Kerens does not challenge his convictions for Tampering with Evidence.

evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; State v. Issa, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

\* \* \*

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶45} The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two

conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

{¶46} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.*

{¶47} Kerens argues that his conviction for murder is against the weight of the evidence. Specifically, he contends.

No forensic evidence — fingerprints or D.N.A. — was presented that would tend to establish that Mr. Kerens had killed Mr. White in a way that was not self-defense. No phone records were presented to show that Mr. Kerens had not acted in self-defense and no witness claimed that Mr. Kerens had admitted to committing Murder. No witness testified that Mr.

Kerens was seen killing Mr. White, luring the decedent to the Kerens' home or otherwise bringing the altercation upon himself. What then must be determined is -whether the circumstantial evidence tending to show — by proof beyond a reasonable doubt that Mr. Kerens did not act in self-defense and is sufficient to overcome the evidence offered by the defense.

Appellant's Brief at 10.

{¶48} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

{¶49} In the case at bar, the jury heard the witnesses and viewed the evidence. The jury saw Kassaundra Phillips, Amanda Kerens and all the witnesses subject to cross-examination. The jury heard and saw Kerens's recorded statement to the police and the recorded telephone calls that he made to his wife from the jail. Thus, a rational basis exists in the record for the jury's decision.

{¶50} Kerens did not testify during his jury trial. A defendant who does not testify is not precluded from requesting an instruction on self-defense *if the evidence otherwise supports the defense. See State v. Seliskar*, 35 Ohio St.2d 95, 96, 298 N.E.2d 582 (1973); *State v. McDade*, 113 Ohio App. 397, 404, 178 N.E.2d 824 (6th Dist. 1959), *citing Graham v. State*, 98 Ohio St. 77, 81, 120 N.E. 232 (1918); *State v. Hatfield*, 9th Dist. No. 23716, 2008–Ohio–2431, ¶ 11. If a defendant cannot provide evidence on the issue of self-defense other than his or her own testimony, then, in order to avail him or herself of the defense, he or she must testify. "In such event, the choice is that of the defendant, and, once he [or she] has decided to rely on self-defense and is required by the circumstances to testify in order to prove that defense, he [or she] necessarily must waive his [or her] constitutional right to remain silent." *Seliskar* at 96.

{¶51} It is clear that Kerens was expecting White to come to Kerens's apartment on the morning of the incident. The evidence established that Kerens had already left work and was at his apartment when he called White to ask where he was and if he was on his way. Shortly thereafter, Kerens called and texted with Phillips. When Phillips arrived at Kerens's apartment she saw a bloody scene and a dead body. Kerens then concocted a story, smeared blood on Phillips, ripped her shirt, struck her and caused her to drag her fingernails on the bloody corpse. Even when confronted with the knowledge

that the police did not believe his made-up rape story, Kerens never gave the officer any specific detail concerning what had actually occurred.  His only statements were to the effect White had attempted to rob him. Kerens claimed that $480.00 was missing from his wallet; however, he gave his wallet and cell phone to his wife at the scene.  Amanda Kerens testified that she took his wallet from the scene because it contained the money needed to pay the couples monthly bills. Only $54.00 was found on White at the time of his death.

{¶52} Amanda Kerens attempted to mislead the police concerning the whereabouts of Kerens's phone. The police were not able to decrypt the phone because they did not have the password.  Amanda Kerens asked Kerens for the code to his cell phone.  Kerens did not give her the code. The day after White's death, Amanda asked Kerens for the code to the Xbox. 3T. at 456. Kerens told Amanda, "You were supposed to get rid of it." 3T. at 456. Kerens in another call told his wife that he cannot tell her what happened over the phone. 3T. at 457.  Kerens told his wife that if he were to be released on bond, he would flee. 3T. at 458. Kerens told his mother in a phone call from the jail that he had no proof of self-defense without Phillips testimony about a rape. 3T. at 459.

{¶53}  In the case at bar, Kerens did not provide any specific details of what had actually occurred from which the jury could find that he was not at fault in creating the situation giving rise to the affray; or that Kerens had a bona fide belief that he was in imminent danger of death or great bodily harm; and that Kerens had used reasonable force to defend himself.  Although he presented evidence of White's violent propensity, Kerens presented no evidence that he was personally aware of any violent tendencies on

White's part. DNA evidence was inconclusive as to whom was the initial aggressor. White had nearly forty-six wounds on his body.

{¶54} The mere fact that Kerens told the police and Phillips that he was being robbed and that he acted in self-defense does not make it so. The state had the burden to disprove beyond a reasonable doubt that Kerens had acted in self-defense. The jury heard the evidence and decided that the state had rebutted any evidence that Kerens had acted in self-defense and had proven beyond a reasonable doubt that Kerens was not acting in self-defense when he stabbed White forty-six times.

{¶55} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Kerens's conviction is not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Kerens's guilt. The jury neither lost their way nor created a miscarriage of justice in convicting Kerens of the offense of murder.

{¶56} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime for which Kerens was convicted.

{¶57} Kerens's Second Assignment of Error is overruled.

III.

{¶58} In his Third Assignment of Error, Kerens maintains that he was denied the effective assistance of counsel because counsel did not request a jury instruction that "a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force" pursuant to R.C. 2901.05(B)(2), as set forth in his First Assignment of Error.

**Standard of Appellate Review.**

{¶59} To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 694 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." Id., at 688, 104 S.Ct. 2052. And to establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S.Ct. 2052. *Andtus v. Texas,* 590 U.S. __, 140 S.Ct. 1875, 1881 (June 15, 2020).

**Issue for Appellate Review:** *Whether there is a reasonable probability that, but for counsel's failure to request a jury instruction as set forth in Kerens's First Assignments of Error the result of the proceeding would have been different.*

{¶60}  As we have discussed in our disposition of Kerens's First Assignment of Error the failure to instruct the jury on the presumption that Kerens had acted in self-defense did not rise to the level of prejudicial error necessary to find that he was deprived of a fair trial.  Having reviewed the record that Kerens cites in support of his claim that he was denied effective assistance of counsel, we find Kerens was not prejudiced by defense counsel's representation of him.  The result of the trial was not unreliable nor were the proceedings fundamentally unfair because of the performance of defense counsel.

{¶61}  Therefore, Kerens has failed to establish that he has been prejudice by trial counsel's performance.

{¶62}  Kerens's Third Assignment of Error is overruled.

{¶63}  The judgment of the Fairfield County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, Earle, J., concur