[Cite as *State v. Staats*, 2021-Ohio-1325.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2019CA00181 |
| | : | |
| DREW STAATS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Canton Municipal
                                Court, Case No. 2019CRB3297




JUDGMENT:                       AFFIRMED




DATE OF JUDGMENT ENTRY:         April 16, 2021




APPEARANCES:

For Plaintiff-Appellee:                 For Defendant-Appellant:

KRISTEN BATES AYLWARD                   GEORGE URBAN
CANTON LAW DIRECTOR                     116 Cleveland Ave. N.
SETH A. MARCUM                          Suite 808
218 Cleveland Ave. SW                   Canton, OH 44702
Canton, OH 44702

*Delaney, J.*

{¶1} Appellant Drew Staats appeals from the November 1, 2019 Judgment Entry of the Canton Municipal Court. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} Jane Doe was 18 years old and a high school senior at the time of trial. In June 2019, she lived with appellant--her boyfriend--at appellant's grandmother's house. Jane Doe paid rent to appellant's grandmother and lived with appellant in the basement.

{¶3} On June 29, 2019, Doe testified that she and appellant "pretty much fought all day" and went to bed mad at each other. On the morning of June 30, Doe tried to talk to appellant but he told her to pack her things and get out. Doe said the argument escalated and appellant repeatedly pushed her backwards onto the bed. Doe continued to try to get up and appellant wouldn't let her. Appellant was "in her face," repeatedly pushing her down; when she was able to get up, he "rushed" her and grabbed her.

{¶4} Doe testified appellant eventually backed away from her and she was able to get out of the bed. They continued to scream at each other. Doe said appellant grabbed her by her arms and pushed her into a pole in the center of the room. She fell into a filing cabinet that was used as a dresser. Doe sustained bruises on her arms, chest, and legs from appellant pushing and grabbing her, and from falling into the filing cabinet. She testified she believed appellant was trying to hurt her.

{¶5} Doe called a friend to come pick her up as appellant's grandmother came downstairs yelling at both of them. Doe did not call police on June 30. She testified she wanted to be out of appellant's grandmother's house and away from the situation before

she called. Doe called police the next day from a friend's house and Deputy Dominic Antenora of the Stark County Sheriff's Department responded.

{¶6} Antenora testified he met with Doe at her friend's house and she made a domestic violence report regarding her live-in boyfriend. Doe was wearing a sleeveless shirt and Antenora noticed bruising on her arms, legs, and chest. He obtained Doe's written and taped statements and noted the bruises were consistent with her statements.

{¶7} Appellee's Exhibit 1 included the photos of Doe taken by Antenora. Doe has a bruise on her chest area, her left arm, and the lower portions of both legs.

{¶8} Antenora went to appellant's grandmother's house to investigate further. He obtained a statement from appellant, who acknowledged pushing Doe repeatedly because he wanted "to get her out of his face."

{¶9} Upon cross-examination, defense trial counsel asked Antenora what explanation Doe offered for not immediately calling police. Antenora responded that Doe didn't want to cause a scene at the grandmother's house. Antenora said he believed Doe wanted to get to a different location before she contacted police. Defense counsel played a bodycam video for Antenora and the deputy acknowledged Doe said to a friend in the background, "I'm going to get a DV charge on you next." Antenora testified he understood the comment to be a joke and didn't find Doe's actions or statements surprising for a domestic-violence victim.

{¶10} Appellant was the only defense witness. He was 21 years old at the time of trial and testified he was in a relationship with Doe for about four months; they lived together only because "[she] forced [him] into it." T. 120. Appellant testified he "gave [Doe] a chance, but she pushed the boundaries too far; he "put a roof over her head" but

was unable to work because she wanted him to be around all the time. T. 120-121. Appellant acknowledged Doe paid rent, although she "wasn't putting forth any effort" in his opinion. Appellant didn't recall what happened on June 29, 2019, other than they fought all day and went to bed mad at each other.

{¶11} The next morning, Doe woke him up too early, demanding sex. He refused and got out of bed, walked to the bathroom, and started putting Doe's property in a bag. He told her to pack up and get out.

{¶12} Appellant testified as follows in describing the domestic violence incident with Doe on June 30, 2019. He admitted pushing Doe to "get [her] out of [his] face." T. 128. Then, he was nose-to-nose with Doe and they screamed in each other's faces. Appellant was protecting himself. She punched him but he couldn't swing back. "And when I couldn't swing back on you—I'm a man of my word and I don't hit females. But I will push you out of my face." T. 129.

{¶13} Then, appellant testified, Doe had the "audacity" to get right back in his face every time he pushed her down: "Until she finally learned. She didn't come back up off the bed then, about the seventh or eighth time, and when she finally realized that, I was like, 'Okay, I can finally move now…'" T. 130. Finally, appellant's grandmother came downstairs and also told Doe to "get the fuck out."

{¶14} Appellant summarized his frustration with Doe and her attitude toward him: "She was more of the manly demeanor type. Like she wanted to be the one to wear the pants in the relationship. She wanted to be the one to boss me around, tell me what to do. She wanted to run the show." T. 132.

{¶15} Appellant acknowledged that Doe's best friend is his cousin, Kenny. Kenny picked her up after the incident on June 30 and Doe moved into Kenny's home. Appellant acknowledged Kenny asked him what happened on June 30 and he admitted pushing Doe.

{¶16} Upon cross-examination, appellant readily admitted pushing Doe down onto the bed repeatedly "until she learned to stop getting in his face." He testified that yes, he did put his hands on her, but "gently," and denied causing the bruises evident in the photos taken by Deputy Antenora. T. 137. On redirect, appellant said it was not possible for him to have caused Doe's bruises because "if I'm going to hit you, I'm gonna mess your stuff up." T. 140.

{¶17} Appellant was charged by criminal complaint with one count of domestic violence pursuant to R.C. 2919.25(A), a misdemeanor of the first degree. He entered a plea of not guilty and the matter proceeded to trial by jury. Appellant was found guilty as charged and the trial court sentenced him to a jail term of 180 days, with all but 63 days suspended and credit for 3 days served. Appellant was further ordered to, e.g., successfully complete an anger-management program and to have no contact with Jane Doe.

{¶18} Appellant now appeals from the judgment entry of conviction and sentence.

{¶19} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶20} "I. THE TRIAL COURT ERRED BY NOT PROVIDING A SELF DEFENSE JURY INSTRUCTION."

{¶21} "II. APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."

{¶22} "III. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

## ANALYSIS

### I.

{¶23} In his first assignment of error, appellant contends he was entitled to a jury instruction on self-defense. We disagree.

{¶24} Appellant argues he was entitled to a jury instruction upon the affirmative defense of self-defense pursuant to R.C. 2901.05. "A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *Williford* at 251, 551 N.E.2d 1279. *See also State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992).

*The affirmative defense of self-defense*

{¶25} Under Ohio law, a person is permitted to act in self-defense, and self-defense is an affirmative defense. R.C. 2901.05(B)(1). To establish self-defense in the use of non-deadly force, the accused must show that: (1) he was not at fault in creating the situation giving rise the altercation and (2) that he had reasonable grounds to believe and an honest belief, even though mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from such danger was by the use of force not likely to cause the death or great bodily harm. *State v. Galloway*, 2016-Ohio-7767, 74 N.E.3d 754, ¶ 26 (5th Dist.), citing *State v. Batrez,* 5th Dist. Richland No. 2007–CA–75, 2008-Ohio-3117, 2008 WL 2587610.

{¶26} Under former R.C. 2901.05(A), the defendant had the burden of proving self-defense by a preponderance of the evidence. Effective March 28, 2019, Ohio's self-defense law was changed to require appellee to establish the defendant did not act in self-defense where the defense could reasonably be found to apply. R.C. 2901.05(A), as amended, states, in relevant part:

> Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense *other than self-defense* * * * as described in division (B)(1) of this section, is upon the accused.) (Emphasis added.)

{¶27} R.C. 2901.05(B)(1) further states:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶28} Thus, if evidence is presented at trial that tends to support that a defendant used nondeadly force in self-defense, appellee must now prove beyond a reasonable doubt that the defendant did not use that force in self-defense. *State v. Jacinto*, 8th Dist. No. 108944, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 46. In other words, appellee must disprove at least one of the elements of the use of nondeadly force in self-defense beyond a reasonable doubt, i.e., the state must prove that (1) the defendant was at fault in creating the situation giving rise to the affray in which the force was used or (2) the defendant did not have reasonable grounds to believe or an honest belief that he or she was in imminent danger of bodily harm or (3) the defendant used more force than was reasonably necessary to defend against the imminent danger of bodily harm. *Id.,* citing *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31; *State v. Nestingen*, 5th Dist. Richland No. 2019 CA 110, 2020-Ohio-2965, ¶ 17.

{¶29} The issue in this case is whether evidence was presented at trial that tends to support that appellant acted in self-defense against Doe.

*Is a self-defense instruction warranted by the evidence?*

{¶30} Appellee has no obligation to disprove all possible affirmative defenses a defendant may claim applies, and appellee need not disprove an affirmative defense unless evidence is presented that is sufficient to raise that defense. *Jacinto*, supra, 2020-Ohio-3722 at ¶ 47. "Evidence 'tends to support' that a defendant used force in self-defense, and a defendant is entitled to a jury instruction on the defense of self-defense under R.C. 2901.05, as amended, where the evidence in the record is sufficient to raise a question of reasonable doubt of guilt, based on a claim of self-defense, in the mind of a reasonable juror." *Jacinto*, supra, 2020-Ohio-3722 at ¶ 48, citing *State v. Tolle*, 4th Dist.

Adams No. 19CA1095, 2020-Ohio-935, 2020 WL 1220898, ¶ 23-24. If the evidence presented 'generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted.' *Tolle* at ¶ 23, quoting *Melchior*, supra, at 20.

{¶31} Appellant did not argue self-defense at trial, or request a jury instruction upon self-defense. Appellant concedes the plain-error standard applies in our review because defense trial counsel neither requested a self-defense jury instruction nor objected to the jury instructions as given. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, citing Crim.R. 30. Accordingly, a jury instruction that allegedly violates R.C. 2901.05(A) does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978); *State v. Kerens*, 5th Dist. Fairfield No. 2020 CA 00011, 2021-Ohio-127, ¶ 33, citing *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) and *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 56.

{¶32} In the instant case, Doe testified she and appellant argued and appellant repeatedly, forcefully, pushed her down on the bed. She also testified appellant pushed

her into a pole and she fell against a file cabinet. Appellant admitted these allegations; he admits they argued and he pushed Doe down onto the bed repeatedly until she "finally learned" not to get back up. T. 130. Since appellant used less than deadly force, he had no duty to retreat and only needed to show that he was not the aggressor and that he feared further bodily harm. *Belanger*, supra, 2010-Ohio-5407 at ¶ 5. In determining whether a jury instruction on an affirmative defense should be given, the court must view the evidence in a light most favorable to the defendant. *Belanger*, supra, 2010–Ohio–5407, ¶ 6. The question of credibility is not to be considered. *Id.*

{¶33} Appellant argues there was sufficient evidence at trial of the affirmative defense of self-defense such that a jury instruction should have been given. In his brief at page 5, appellant states the evidence showed he was "attacked" by Doe, tending to support his argument of self-defense and shifting the burden of proof to appellee to prove beyond a reasonable doubt that appellant did not act in self-defense. Appellant cites four pages of the record without pointing to specific statements. We will review appellant's cited evidence.

{¶34} At page 93, Doe testifies upon direct examination as follows:

* * * *.

[Prosecutor]: So what happened when you woke up on June 30th?

[Doe]: I tried to roll over and talk to him and he just told me to get out, just—he didn't want anything to do with me and it turned into a huge fight, which led to him getting in my face, pushing back onto the bed and then that happened for a couple minutes. He finally

backed away and I got away from the bed and went to the center of the room, I guess you would call it, and we started fighting again. It was a screaming battle. Um, he had grabbed me by my arms right here and pushed me into a pole that's in the center of his room. He, after he had pushed me, I had fallen into a filing cabinet that was being used as a dresser, and I had gotten back, I grabbed my phone. By then his grandma was downstairs yelling at us, but I grabbed my phone, I called my best friend and I told 'em to come pick me up 'cuz I was done.

     \* \* \* \*.

{¶35} At page 121, appellant testifies upon direct examination as follows:

[DEFENSE COUNSEL]: What do you mean she forced herself into your life?

[APPELLANT]: Originally I didn't want a relationship with her. Four, five, six months back, prior to us dating. Well, she was so persistent I was kinda stuck to give her a chance because, well, she forced her way into my life. And by forcing my way into her life, I mean not just moving out from her friend's house but coming and moving in with me, leeching off of me—I put a house over her head, put food on the table for her, helped her to pay bills. She didn't pay much for anything. I got my—I got chewed out all the time by my grandmother because I let someone else move in after she told me not to, because I'm expecting—well, you're going to come out here

and help me pay bills, right? No. I'm stuck doin' it all. I'm working.
Well, I really wasn't even working because at the time she didn't want
me to leave. She wanted to be with me all the time. I'm like, "I gotta
get outta here and work. I got bills to pay. I got money that I need
to make for people. I—how am I gonna feed you and feed me and
keep a roof over our head and then pay bills on top of all that if you
won't let me leave the house or get out of this bed?

[DEFENSE COUNSEL]: Did you have responsibilities in the
house other than paying rent?

[APPELLANT]: Yes, sir, I did. I had to keep the house clean.
I cu—helped cut the grass, I took care of the laundry, I took care of
trash, dishes. I—I—couldn't live like a pig. That's not how I was
raised.

* * * *.

{¶36} Finally, appellant directs us to pages 129 and 130. For clarity, we begin
with appellant's narrative testimony on page 128, continuing onto pages 129 and 130:

* * * *.

[APPELLANT]: I will tell you why I said [to Deputy Antenora
that I pushed Doe], and why I did that. At the time we were actually,
yeah, at the time we were talkin'—he's talking about when I pushed
her was when we were in the basement and the argument was
started. Well that was at the time she got up out of the bed, got up
in my face, had me backed up against a TV stand that's by the ba—

bathroom door.  I can't move.  I move, the only way I'm gonna move is right into you, so yeah, I pushed her on to a—mind you—a thousand dollar Tempur-Pedic bed.  So if anything I fixed her back problems in the process.  Don't take that as a joke or anything but—

[DEFENSE COUNSEL]:  Let's talk about when you say she was in your face, how close are we talking?

[APPELLANT]:  Close to close.  Literally almost nose to nose.

[DEFENSE COUNSEL]:  Almost nose to nose.

[APPELLANT]:  Screaming at the top of her lungs.  Over and over again, I told her get the …out of my face. About seven times I told her.  Seven times she didn't listen.  I'm sorry, I'm acting on it.  I'm protecting myself. Get out of my face. Because prior to that you've also punched me in my jaw. And when I couldn't swing back on you—I'm a man of my word and I don't hit females.

[DEFENSE COUNSEL]:  You don't hit females?

[APPELLANT]:  No.  I will push you out of my--

[DEFENSE COUNSEL]:  Why's--

[APPELLANT]: --face.

[DEFENSE COUNSEL]:  --that?

[APPELLANT]:  Because the way I've come up, that is complete disrespect and utter just—I will beat the breaks off any dude—you put your hands on a female in front of me, it's game over.

Dude, you don't hit a woman in front of me. Like that is the worst sign of disrespect you can show to any—show me at all.

[DEFENSE COUNSEL]: Is that a rule you live by?

[APPELLANT]: That is the rule I've grown up by. I respect women. The most I will do to you, I will protect myself. I will push you to get you out of my face. Balling my fist and swinging on you? Yee-shhh…I fight—I fight for that. I will get—I will fon—I will fight another guy, you hit a woman in front of me. I don't deal with woman abuse. That is one thing I come up and I—I don't—I don't like that.

[DEFENSE COUNSEL]: I see. Let's go back to the interaction with you and [Doe] in the house. You're nose to nose at this point. What happens at that point?

[APPELLANT]: She's screaming at the top of her lungs in my face and I'm telling her over time after time again, seven times in a row, "Get out of my face." She didn't listen. So that's when I pushed her onto the bed. Well, she had the audacity every time, yeah, I pushed her back onto the bed multiple times 'cuz each time she'd come back up and get right back in my face and started yelling again. Until she finally learned. She didn't come back up off the bed the, about the seventh or eighth time, and when she finally realized that, I was like, Okay, I can finally move now, 'cuz I don't have to worry about her coming back up into my face and something happening, because she's thrown ten coun—ten pound concrete bricks at me.

She's thrown bats at me. She's thrown books at me. She's—luckily

has not thrown any of the swords I have around my room at me. Um,

she's thrown pill bottles at me of the pills she tried to overdose with.

* * * *.

{¶37} Appellant asks us to discern from his cited evidence that repeatedly pushing Doe onto the bed and into the pole was reasonably necessary to protect him from Doe's imminent use of unlawful force. "The degree of force one may use to defend oneself depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force." *Belanger,* supra, 2010–Ohio–5407, at ¶ 4, citing *Akron v. Dokes,* 31 Ohio App.3d 24 (9th Dist.1986). Appellant must demonstrate he had a fear of bodily harm. Where the defendant uses less than deadly force, he need only show a fear of bodily harm, not a fear of death or great bodily harm. *State v. Perez,* 72 Ohio App .3d 468 (10th Dist.1991). Furthermore, in non-deadly force cases, the defendant need only show that he was not at fault in creating the situation, and that he had a genuine belief that he was in imminent danger of bodily harm. *Belanger,* 2010–Ohio–5407, at ¶ 4, citing *Johnson,* 2006–Ohio–2380, at ¶ 21.

{¶38} We are required to determine whether appellant introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable people concerning the existence of the issue of self-defense. *Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978), paragraph one of the syllabus. We disagree with appellant's characterization of the record that Doe attacked him. Even assuming a reasonable juror could find appellant was not at fault in creating the situation that gave rise to the altercation, no evidence was presented that "tended to support" that appellant believed

he was in imminent danger of bodily harm prior to pushing Doe repeatedly on the bed and into the filing cabinet. Instead, despite appellant's self-serving claims of defending himself, all we can glean from appellant's cited evidence is that Doe was "in his face." The vague allegations that she punched him and threw items at him, in context, seem to have happened in the past.  Appellant cites no evidence from which we may find he was in fear of bodily harm from Doe on June 30, 2019, or that he needed to push her repeatedly to defend himself from her imminent use of unlawful force.

{¶39} After reviewing the testimony and evidence presented at trial, we are not persuaded that the trial court committed plain error by failing to instruct the jury on self-defense. We note that appellant's defense at trial, via his own testimony, was that his conduct toward Doe was justified because she "got in his face" and he didn't cause the bruises. Appellant did not state he was in fear of bodily harm; as he told Antenora, he merely wanted to stop her "from getting in his face."  An instruction upon self-defense was not warranted by appellant's cited evidence or our review of the record of the entire trial.

{¶40} Appellant's first assignment of error is overruled.

II.

{¶41} In his second assignment of error, appellant argues he received ineffective assistance of defense trial counsel.  We disagree.

{¶42} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶43} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶44} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶45} Appellant argues defense trial counsel was ineffective in failing to argue, and request a jury instruction upon, self-defense. In light of our decision supra that a self-defense instruction was not warranted by the evidence, we find defense trial counsel was not ineffective in failing to make such an argument. Appellant's rancor toward Doe was apparent from his testimony; there was no evidence he had a genuine belief that he was in imminent danger of bodily harm from Doe.

{¶46} Appellant has not established ineffective assistance of counsel, and his second assignment of error is overruled.

III.

{¶47} In his third assignment of error, appellant argues his domestic violence conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree.

{¶48} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶49} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering

a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶50} Appellant was found guilty upon one count of domestic violence pursuant to R.C. 2919.25(A). Appellee was therefore required to prove appellant knowingly caused or attempted to cause physical harm to Doe, a family or household member. Appellant argues his conviction is against the manifest weight and sufficiency of the evidence because Doe didn't seek medical attention and sustained only mild bruising, she reported the incident the day after it occurred, she is "prone to harm herself," and he acted in self-defense.

{¶51} We have already dispensed with appellant's arguments regarding self-defense in our analysis of his first and second assignments of error. Regarding Doe's credibility, the weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Appellant points to Doe's joke about "getting a domestic violence charge on" her friend as evidence that she manufactured the allegations against appellant, but we note the investigating officer heard the comment and took it as a joke. Antenora also testified that it is not unusual for a domestic violence victim to contact police after the incident, when she is away from the offender. Antenora emphasized Doe made the report within 24 hours of the events.

{¶52} Nor was appellee required to prove Doe's injuries were severe. "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Doe and Antenora testified to the bruises

caused by appellant, and the jury could view the bruises in the photos contained in appellee's Exhibit 1.

{¶53} Have viewed the probative evidence and inferences drawn therefrom in the light most favorable to appellee, we conclude any rational trier of fact could have found proof of each element of domestic violence beyond a reasonable doubt. We therefore find sufficient evidence to sustain appellant's conviction.

{¶54} Furthermore, upon our review of the entire record, having weighed the evidence and reasonable inferences, and considered the credibility of witnesses, we find that in resolving conflicts in the evidence, the jury did not lose its way and create such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. This is not an exceptional case in which the evidence weighs heavily against conviction.

{¶55} Appellant's third assignment of error is overruled.

## CONCLUSION

{¶56} Appellant's three assignments of error are overruled and the judgment of the Canton Municipal Court is affirmed.

By: Delaney, J.,

Hoffman, P.J. and

Wise, John, J., concur.