[Cite as *State v. Carter*, 2025-Ohio-5751.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 2025-CA-0002 |
| Plaintiff - Appellee | <u>Opinion and Judgment Entry</u> |
| -vs- | Appeal from the Richland County Court of Common Pleas, Case No. 2023-CR-0344R |
| WILLIAM CARTER | Judgment: Affirmed |
| Defendant – Appellant | Date of Judgment Entry: December 23, 2025 |

**BEFORE:** Craig R. Baldwin, William B. Hoffman, Kevin W. Popham, Appellate Judges

**APPEARANCES:** Jodie M. Schumacher, Richland County Prosecuting Attorney, Michelle Fink, Assistant Prosecuting Attorney, for Plaintiff-Appellee; Todd W. Barstow, for Defendant-Appellant

OPINION

*Hoffman, J.*

**{¶1}** Defendant-appellant William Carter appeals his convictions and sentence entered by the Richland County Court of Common Pleas, which found him guilty of one count of murder, one count of felonious assault, one count of having weapons under disability, and one count of tampering with evidence, following a jury trial. Plaintiff-appellee is the State of Ohio.

## STATEMENT OF THE CASE AND FACTS

**{¶2}** On May 19, 2023, the Richland County Grand Jury indicted Appellant on one count of murder, in violation of R.C. 2903.02(A) and (D), an unclassified felony, with a firearm specification (Count 1); one count of murder, in violation of R.C. 2903.02(B) and (D), an unclassified felony, with a firearm specification (Count 2); one count of felonious assault, in violation of R.C. 2903.11(A)(2) and (D)(1)(a), a felony of the second degree, with a firearm specification (Count 3); one count of having weapons while under disability, in violation of R.C. 2923.13(A)(3) and (B), a felony of the third degree (Count 4) ; and one count of tampering with evidence, in violation of R.C. 2921.12(A)(1) and (B), a felony of the third degree (Count 5). Appellant appeared before the trial court via video for arraignment on December 21, 2023, and entered a plea of not guilty to the charges.

**{¶3}** After a number of continuances, a jury trial commenced on December 9, 2024. The following evidence was presented at trial:

**{¶4}** On April 30, 2023, Cherrie Cook, her 6-year old daughter, and her boyfriend, Darrin Marsh, drove from Columbus to Mansfield to pick up Marsh's infant daughter. Marsh was driving his blue Dodge pickup truck. Cook planned to see if her daughter's

father, Karon Brown, wanted to spend some time with the child. Brown lived on Dunbilt Court in Mansfield. When Cook and Marsh arrived in Mansfield, they traveled directly to Dunbilt Court, drove around the cul-de-sac, and parked in front of Brown's residence. Cook and Marsh had a brief conversation during which Marsh told Cook he was going to talk to some people across the street. Before Marsh exited the vehicle, Cook discreetly handed him a gun. Cook explained she gave Marsh the gun "[b]ecause I was just kind of scared to be in [Mansfield], and if anything was to happen, I would want him to be able to protect me and my daughter." Transcript of Trial, Vol. IV, p. 385. Marsh placed the gun in his pants pocket and exited the vehicle.

{¶5} As Cook was texting Brown, she heard a clink on the window. She turned to see if someone was tapping on the window and noticed what appeared to be a bullet hole in the driver's window. Cook ducked down and told her daughter to get on the floor. Cook did not know if she blacked out or if it was the stress of the situation, but she could not remember hearing anything after seeing the bullet hole. After a few minutes, Cook got up. She immediately called Marsh, but he did not answer. Brown called and asked Cook if she and their daughter were in Marsh's truck. Brown came outside. He and Cook took their daughter inside Brown's house. Cook returned to Marsh's truck to retrieve her phone. As she walked back to Brown's house, Cook heard a woman say someone was down in the backyard. Cook ran toward the backyard, but Brown forced her into the house. Cook tried to exit through the backdoor, but Brown stopped her. Cook raised the kitchen blinds and saw Marsh laying facedown in the backyard. Marsh was motionless.

{¶6}   Mansfield Police Officer Eric Schaaf was on duty on April 30, 2023, when he was dispatched to Dunbilt Court following a ShotSpotter alert.[1]  Officer Schaaf and Officer Hall, his backup, were the first to arrive at the scene. Upon his arrival, Officer Schaaf observed a white Chevrolet Malibu reversing out of the driveway of 19 Dunbilt Court. Officer Schaaf provided a description of the vehicle to dispatch.

{¶7}   Officer Hall and Officer Schaaf exited their cruisers and walked down the street to investigate. Individuals near 9 Dunbilt Court flagged down the officers and reported someone was down behind 8 Dunbilt Court. The officers proceeded to the location and discovered an unresponsive male with apparent gunshot wounds to the chest. The unresponsive male was subsequently identified as Darrin Marsh. Officer Schaffer called for the fire department and paramedics as well as additional units.  He explained the scene was becoming chaotic as people had started to exit their homes, and were yelling and screaming.  Officer Schaaf was concerned about being caught off guard. Officer Schaff and Officer Hall rendered aid to Marsh until emergency medical personnel arrived. Once additional officers arrived, the scene was secured.

{¶8}   Debra Swiger, who was residing at 20 Dunbilt Court at the time of the shooting, testified, on April 30, 2023, she was sitting in her dining room when she heard gunshots, then screaming.  Swiger did not observe the shooting, however, she had two security cameras mounted on the outside of her home.  One camera was mounted on the house and captured her detached garage.  The other camera was on the peak of the garage and captured the back door of her home.  The surveillance video from the evening of the shooting was admitted into evidence and played for the jury.  The video showed a

---

[1] "ShotSpotter is an advanced system of sensors, algorithms, and artificial intelligence that detects, locates, and alerts police to gunshots in real time." *State v. Edmonds*, 2020-Ohio-1148, ¶ 5, fn. 1 (7th Dist.).

blue truck pull up, and the occupants of the vehicle exit and walk around to the front. The video also showed people scattering after hearing the gunfire.

**{¶9}** Suzanne Madden testified Appellant is her grandson's father. On the afternoon of April 30, 2023, Madden's sister, Joan King, drove Madden to 19 Dunbilt Court to pick up her granddaughter. Madden's mother, King's daughter, and two of King's grandchildren were also in the vehicle. King parked in the driveway and the family waited in King's car for Madden's granddaughter to come out.

**{¶10}** While they were waiting, Madden heard what sounded like a cap gun. She looked up and saw Appellant with a gun drawn. Madden noticed "clips" coming from the side of the gun. Madden also observed a male individual walking across the median away from a blue truck. Madden recalled the individual looked calm as he approached the house, but after the shots were fired, the individual turned and began running in the opposite direction back towards the blue truck. Madden did not hear Appellant and the individual exchange words and did not observe any kind of gesturing between the two men. Madden stated the individual was not holding a gun.

**{¶11}** Joan King recalled she was sitting in her parked car on Dunbilt Court, waiting for her sister's granddaughter, when she heard gunshots. King noted the sound was faint. King looked to her left and saw an individual running away from the gunfire. The individual's back was towards her. King then looked back and saw Appellant with his arm extended. King noticed what appeared to be shells dropping from the object in Appellant's hand. King acknowledged she did not see what Appellant was holding.

**{¶12}** Aaron Hoptry, a firefighter/paramedic with the Mansfield Fire Department, responded to the April 30, 2023 shooting on Dunbilt Court in his capacity as a paramedic.

Officers from Mansfield Police Department were at the scene and were performing CPR on Marsh as well as applying pressure to Marsh's wounds. Paramedics took over and began trauma care. Marsh was alive and paramedics transported him to OhioHealth Mansfield Hospital. Hoptry was in the back of the ambulance on the trip to the hospital and continued to provide care to Marsh. Hoptry and the other paramedics remained in the trauma area as emergency room staff began working on Marsh. While emergency room staff finished removing Marsh's clothing, a nurse discovered a firearm in the front left pocket of Marsh's jeans.

{¶13} Samantha Kelly, an armed security guard at OhioHealth, was working on April 30, 2023, when Marsh was brought into the emergency room. Medical staff informed Kelly she was needed in Marsh's room as something was found in his pocket. Kelly further searched Marsh's clothing and located a firearm in the front left pocket of his jeans. Kelly removed the magazine and checked the chamber. Kelly noted the chamber was empty. Lieutenant Elijah Bishop secured the firearm and contacted the Mansfield Police Department.

{¶14} Mansfield Police Sergeant Patrick Williams arrived at Dunbilt Court to assist with the crime scene, but was dispatched to the hospital to retrieve evidence. Hospital security gave Sergeant Williams the firearm found in Marsh's pant pocket. When Sergeant Williams took possession of the firearm, he confirmed there were no rounds in the chamber. The firearm was subsequently submitted to the crime lab as evidence.

{¶15} Dr. Bryan Casto, the Montgomery County deputy coroner and a forensic pathologist, conducted the autopsy on Marsh. The autopsy revealed Marsh suffered gunshot wounds to the torso, face, and left upper arm. The gunshot wound to Marsh's

torso entered through his left back, left of his spine, and exited his left breast. The bullet traveled through the tenth rib in the back, through vertebra, the stomach, liver, diaphragm, and heart before exiting through the left fourth rib in the front. Dr. Casto noted the gunshot wound to the torso was the most critical. Dr. Casto explained the entrance and trajectory of the gunshot wound to the torso indicated Marsh was shot from the back.

{¶16} The second gunshot wound was a graze wound to the left cheek and face. The shot was fired from behind with the bullet traveling from behind the ear and moving towards the nose. The wound only involved the skin and there were no other injuries associated with it. The third gunshot wound to Marsh's left upper arm only affected the skin and subcutaneous fat. The bullet did not hit a bone or strike a major artery. Dr. Casto stated it was possible the third shot also came from the back. Dr. Casto did not recover any bullet fragments from any of Marsh's wounds.

{¶17} Detective Terry Butler of the Mansfield Police Department interviewed Appellant on May 4, 2023. Appellant informed Detective Butler he keeps his dogs in the garage at 19 Dunbilt Court and, although he was there all day on April 30, 2023, he had left briefly to go to the Lexington Avenue Drive-Thru. Appellant told Detective Butler he was returning to 19 Dunbilt Court when he heard gunshots. When Appellant arrived, he saw a commotion. His girlfriend and her son entered Appellant's vehicle and they left the area. During the interview, Appellant acknowledged he knew Marsh, but denied any bad blood between the two men. Appellant did not mention any prior threats Marsh made to him. Appellant did not claim he saw Marsh with a gun on April 30, 2023.

{¶18} Mansfield Police Detective Larry Schacherer detailed the collection of evidence at the crime scene, including videos from home security systems, and the

ensuing investigation. From the Ring doorbell camera of a Dunbilt Court resident, officers were able to identify a white vehicle Appellant and Miyoshi Ward, his girlfriend, shared. As the result of a search of the Flock Safety System ("Flock"), officers were led to a grey Ford Fusion registered to Ward.[2] Through Flock, the Fusion was located in the Akron area. After the Akron Police Department found the vehicle, Appellant was taken into custody. Ward was taken into custody the next day. Ward initially told Detective Schacherer Appellant was at the Lexington Avenue Drive-Thru at the time of the shooting, but admitted she was lying when she was confronted with surveillance video.

**{¶19}** Detective Schacherer interviewed Appellant on May 11, 2023, and recorded their conversation, which was played for the jury. Initially, Appellant reiterated he was at the Lexington Avenue Drive-Thru at the time of the shooting and did not know anything. Based upon his conversation with Ward and video from Debra Swiger's security camera, Detective Schacherer knew Appellant was lying and confronted him. Appellant changed his story and admitted he was not at the drive-thru when the shooting occurred. Appellant told Detective Schacherer about his frustrations with Marsh. Appellant claimed Marsh had slept with his current and former girlfriends. Appellant felt Marsh was corrupting his sons, and when he told Marsh to stop influencing his sons, Marsh told Appellant to stop being a crackhead. Marsh also gloated about being financially better off than Appellant.

**{¶20}** During the interview, Appellant explained he was inside the residence at 19 Dunbilt Court when he saw Marsh exit his vehicle. Appellant stated he panicked and proceeded to his car to retrieve a gun. Appellant walked toward Marsh's truck and tried

---

[2] "Flock cameras record every vehicle which passes through a camera's intersection throughout the course of the day. Law enforcement personnel are able to search Flock using identifying information, including make, model, and color of a particular vehicle and time of day and Flock will provide images based upon those perimeters." *State v. Olsen*, 2024-Ohio-5671, ¶ 10 (5th Dist.).

to shoot, but his gun jammed. Appellant was able to get the gun working and began shooting at Marsh, who ran. Appellant never told Detective Schacherer he saw Marsh with a gun or that he saw Marsh reach for something in his pocket. Appellant did not claim Marsh made threatening gestures towards him. Appellant told Detective Schacherer he was relieved when he learned Marsh had a gun.

{¶21} Detective Schacherer collected two phones from Marsh's truck. The data retrieved from the phones did not reveal any communications between Marsh and Appellant. Likewise, a review of Marsh's social media accounts showed no contact with Appellant or contain any reference to Appellant.

{¶22} Appellant testified on his own behalf. Appellant stated, during his most recent incarceration, he learned Marsh and a young man named "Henny" were negatively influencing his sons. This information made Appellant upset and he ultimately had several conversations with Marsh about his sons. During a conversation in December, 2022, Appellant warned Marsh they "were going to have some issues" if Marsh continued to be involved with his sons. Appellant subsequently learned Marsh was criticizing him, "talking down on" him, saying Appellant was nothing, was broke, and was a junkie. Trial Transcript, Vol. VI, p.734. Appellant recalled, on a few occasions when he saw Marsh driving his truck, Marsh drove left of center, swerving toward him, "like little taunting gestures at the time." *Id*. at p. 736. Appellant explained he interpreted these taunts as threats.

{¶23} Turning to April 30, 2023, Appellant recalled he and Ward were "kicked out" of the motel where they were staying after Appellant was captured on surveillance video getting high. They proceeded to 19 Dunbilt Court to tend to his dogs. Appellant's friend

lived at 19 Dunbilt Court and had allowed Appellant to keep his dogs in the garage. During the afternoon, Appellant "got scared" when he observed Marsh's blue truck drive onto Dunbilt Court. *Id*. at p. 739. He proceeded to his car and retrieved his gun. Appellant then walked to the end of the driveway to see where Marsh went. He saw Marsh pull up in front of the house. As Marsh exited his truck, Appellant saw someone hand him a gun. Marsh turned in Appellant's direction and "that's when the shooting started." *Id*. at p. 740. When the shooting stopped, Marsh ran around his truck and Appellant ran in the opposite direction, directed his girlfriend and her son to get in their car, and left the area. Appellant discarded the firearm during the ride to Columbus.

{¶24} On cross-examination, Appellant acknowledged Marsh did not slow his truck as he drove by and did not yell at him. Appellant also acknowledged Marsh did not say anything to him or make any gestures towards him before the shooting. Appellant was not sure if Marsh had seen him as Marsh walked toward 19 Dunbilt Court.

{¶25} The prosecutor played security video showing Marsh running away from Appellant while Appellant continued to fire his gun at him. Appellant did not remember continuing to shoot at Marsh, but stated he ran in the opposite direction once he realized Marsh was running off. Appellant would not agree the video showed him shooting at Marsh as Marsh ran away, explaining:

> I don't want to agree to that because it's – the way it sounds, it sounds like I'm shooting at him as he runs away. No, it wasn't like that. My intentions were to push the threat back.
>
> *Id*. at p. 768.

**{¶26}** When asked if Marsh pulled out a firearm, Appellant replied, "Yes, sir. When he got out of the truck, someone handed him a gun." *Id*. at p. 770. However, Appellant could not remember if he saw Marsh remove the gun from his pocket. Appellant conceded he lied multiple times during his interviews with Detectives Butler and Schacherer. Appellant acknowledged he told Detective Schacherer he was relieved to learn Marsh had a gun on him because he (Appellant) "felt like I got him before he got me," but asserted the statement was taken out of context. Appellant agreed he never told either detective he saw someone hand a gun to Marsh or saw Marsh pull out a gun. Appellant admitted he did not tell the detectives Marsh had verbally threatened him on April 30, 2023, and actually told Detective Schacherer, "I already got my mind made up when I see him I'm going to beat the fuck out of [Marsh]." *Id*. at p. 786.

**{¶27}** Upon the conclusion of Appellant's testimony, the defense rested its case. After hearing all the evidence and deliberating, the jury found Appellant guilty as indicted. Appellant appeared before the trial court for sentencing on December 19, 2024. The trial court merged Count 3, felonious assault, with Count 2, murder, and merged Count 2 with Count 1, murder. The trial court imposed an aggregated term of incarceration of 27 years to life. The trial court ordered the sentence be served consecutively to the sentences imposed for prior convictions in Richland and Summit Counties.

**{¶28}** It is from his convictions and sentence Appellant appeals, raising as his sole assignment of error:

I. THE JURY'S VERDICTS OF GUILTY AS TO MURDER AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS NOT ACTING IN SELF-DEFENSE WHEN HE SHOT AND KILLED DM.

I

{¶29} In his sole assignment of error, Appellant challenges his convictions for murder and felonious assault as against the manifest weight of the evidence. Specifically, Appellant contends the State failed to satisfy its burden to prove beyond a reasonable doubt Appellant did not shoot Marsh in self-defense. We disagree.

*Standard of Review*

{¶30} The term "manifest weight of the evidence" relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 n.4 (1997); *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶31} In determining whether a judgment is against the manifest weight of the evidence, an appellate court reviews the entire record, " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "

*Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Sitting as the "thirteenth juror," the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion. *See id.*

{¶32} When conducting a manifest weight review, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient. *Thompkins*, 78 Ohio St.3d at 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001). Appellate courts have traditionally presumed the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in evaluating credibility. *Eastley*, 2012-Ohio-2179 at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984).

{¶33} A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *Thompkins*, 78 Ohio St.3d at 387. To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, 874 N.E.2d 1198, 115 Ohio St. 3d 291, citing *Thompkins*, syllabus ¶ 4.

*Analysis*

{¶34} Appellant was convicted of murder, in violation of R. C. 2903.02(A), which states "[no] person shall purposely cause the death of another person." At trial, Appellant claimed his use of force was in self-defense.

**{¶35}** "When an accused asserts the defense of self-defense he does not seek to negate any of the elements of the offense which the state is required to prove." *State v. Watson*, 2023-Ohio-3137, ¶ 80 (5th Dist.). "Self-defense is not merely a denial or contradiction of evidence offered by the state to prove the essential elements of the charged crime." *Id*. "Rather, it is an admission of the prohibited conduct coupled with a claim that the surrounding facts or circumstances exempt the accused from liability therefor— 'justification for admitted conduct.' " *Id*., citing *State v. Poole*, 33 Ohio St.2d 18 (1973).

**{¶36}** Under R.C. 2901.05(B)(1) there are two burdens. *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 18 (8th Dist.). The defendant has the initial burden of production, which is the burden of producing evidence "that tends to support" the defendant used the force in self-defense. *State v. Messenger*, 2022-Ohio-4562, ¶ 21. The burden then shifts to the State, which under its burden of persuasion, must prove beyond a reasonable doubt the defendant did not use the force in self-defense. *Id*. at ¶ 24. In other words, if the evidence tends to support the defendant acted in self-defense, then the prosecution must prove beyond a reasonable doubt the defendant did not act in self-defense. R.C. 2901.05(B)(1); *Id*. at ¶26; *State v. Gatewood*, 2021-Ohio-3325, ¶ 68 (1st Dist.). The state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden. *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986). *Accord, State v. Staats*, 2021-Ohio-1325, ¶ 28 (5th Dist.).

**{¶37}** In order to establish the inapplicability of self-defense, the State must prove beyond a reasonable doubt (1) the defendant was at fault in creating the situation giving rise to the affray; (2) the defendant lacked a bona fide belief that he was in imminent

danger of death or great bodily harm or that another means of escape from such danger existed negating the need for the use of deadly force; *or* (3) the defendant violated a duty to retreat or avoid the danger. *State v. Walker*, 2021-Ohio-2037, ¶ 14 (8th Dist.). The State "need only disprove one of the elements of self-defense to sustain its burden at trial" the defendant was not acting in self-defense. *Id*.

**{¶38}** With respect to the first element, Appellant asserts the record establishes he was not at fault in creating the situation on Dunbilt Court, but rather Marsh was at fault. Appellant questions why Marsh proceeded to Dunbilt Court before picking up his child. Appellant suggests Marsh knew Appellant was staying on Dunbilt Court and wanted to settle the score with Appellant as "[Marsh] came armed and ready." Brief of Appellant at p. 2.

**{¶39}** Cherrie Cook testified Karon Brown, her daughter's father, lives on Dunbilt Court and, while she and Marsh were in Mansfield, she planned to see if Brown wanted to spend time with the child. Cook explained she and Marsh went straight to Dunbilt Court "because when we got off the highway, we get off the south side" and "Dunbilt is right there." Tr., Vol. IV at p. 380. Cook added she and Marsh did not have specific plans to visit people while they were in Mansfield and were "just kind of going with the flow." *Id*. at p. 382. Cook stated she inconspicuously handed her gun to Marsh before he exited his truck because she was scared to be in Mansfield "because Mansfield has been crazy lately." *Id*. at p. 386. Cook indicated Marsh did not have any apprehension regarding Appellant.

**{¶40}** During his direct examination, Appellant testified he and his girlfriend had been "kicked out" of the motel where they were staying after Appellant was captured on

surveillance video getting high. They proceeded to his friend's home at 19 Dunbilt Court to tend to his dogs. Contrary to Appellant's assertion in his Brief to this Court, Appellant was not "staying" on Dunbilt Court, he was visiting. Further, there was no evidence presented to establish Marsh knew Appellant would be on Dunbilt Court on April 30, 2023.

**{¶41}** Appellant explained, when he noticed Marsh's truck drive onto Dunbilt Court, he "got scared" and immediately proceeded to his car to retrieve his gun. Appellant claimed he saw someone hand Marsh a gun as Marsh exited his truck, but conceded he did not see a gun in Marsh's hand. As soon as Marsh walked in his direction, Appellant started shooting. On cross-examination, Appellant acknowledged Marsh did not slow his truck as he drove by and did not yell at him. Appellant also admitted Marsh did not say anything to him or make any gestures towards him before the shooting. Appellant was not sure if Marsh had even seen him. Video from a home security camera depicted Marsh running away from Appellant while Appellant continued to fire at him.

**{¶42}** Montgomery County deputy coroner and forensic pathologist Dr. Bryan Casto conducted the autopsy on Marsh. Dr. Casto testified all three gunshot wounds entered from behind.

**{¶43}** Based upon the foregoing evidence, we find the jury's determination the State disproved the first element of self-defense beyond a reasonable doubt would not be against the manifest weight of the evidence.

**{¶44}** Though unnecessary given the foregoing conclusion, we shall address Appellant's arguments relative to the remaining two elements of self-defense.

**{¶45}** With respect to the second element, Appellant maintains he had reasonable grounds to believe he was in imminent danger. Appellant explains his "decision to defend

himself by shooting [Marsh] was not made in a few seconds," but based upon his history with Marsh. *Id*. at p. 3.

**{¶46}** The second element of self-defense "is a combined subjective and objective test." *State v. Helmondollar*, 2024-Ohio-2077, ¶ 43 (5th Dist.), quoting *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). Thus, Appellant's "belief must be objectively reasonable under the circumstances and he must subjectively believe he needed to resort to force to defend himself." *Id.*, citing *Thomas* at 330-331.

**{¶47}** "The subjective part requires consideration of whether the defendant himself actually believed that he was in imminent danger." *Id.* at ¶ 44, citing *State v. Watson*, 2023-Ohio-3137, ¶ 86 (5th Dist.). The objective part of the test requires consideration of "whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack," a reasonable person would believe that danger was imminent.'" *Helmondollar*, 2024-Ohio-2077, at ¶ 44, quoting *Watson*, 2023-Ohio-3137, at ¶ 86.

**{¶48}** Here, the evidence does not support Appellant's contention he possessed the necessary objective and subjective beliefs he was in imminent or immediate danger of death or great bodily harm. Appellant testified he was upset with Marsh as he believed Marsh was negatively influencing his sons. Appellant warned Marsh they "were going to have some issues" if Marsh continued to be involved with his sons. Appellant told Marsh he would break his face. Marsh responded he was "going to blow [Appellant's] ass." Tr. Vol. VI, p. 743. Appellant recalled, on a few occasions when he saw Marsh driving his truck, Marsh drove left of center, swerving toward him, "like little taunting gestures at the time." *Id*. at p. 736. Appellant interpreted these taunts as threats.

**{¶49}** Neither words alone nor fear itself will constitute evidence of serious provocation. "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane*, 63 Ohio St. 3d 630, 634-35 (1992). Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage. *State v. Mack*, 82 Ohio St.3d 198, 201 (1998).

**{¶50}** Implicit in the second element of self-defense is the requirement the degree of force used was warranted under the circumstances and proportionate to the perceived threat. *Watson*, 2023-Ohio-3137, at ¶ 88, citing *State v. Kean*, 2019-Ohio-1171, ¶ 58 (10th Dist.). As to the degree of force which is permitted, a defendant is privileged to use the amount of force reasonably necessary to repel the attack. *State v. Williford*, 49 Ohio St. 3d 247 (1990). Appellant's use of deadly force was disproportionate to the perceived threat. Deadly force was not reasonably necessary when there was no evidence Marsh was on the attack. Marsh was running away from Appellant while Appellant shot at him. Appellant never saw Marsh remove Cook's firearm from his pocket. Marsh was not a threat. We find the jury's determination the State proved beyond reasonable doubt Appellant did not have a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escape was to use deadly force would not be against the manifest weight of the evidence.

**{¶51}** With respect to the third element of self-defense, Appellant contends he "was in a place he had a right to be, namely his own home, and had no duty to retreat from the advancing threat posed by [Marsh.]." Brief of Appellant at p. 3. The residence at 19 Dunbilt Court was not Appellant's home. His friend had allowed Appellant to keep his dogs in the garage at the property. Appellant and Ward had been staying at a hotel

before they were ejected due to Appellant's drug use.  While Appellant was tending to his dogs, Ward was on her phone trying to locate somewhere for them to stay. Appellant had a duty to retreat, but chose not to do so.   Instead, Appellant pursued Marsh, shooting Marsh as he was running away. We find the jury's determination the State proved beyond a reasonable doubt Appellant violated his duty to retreat or avoid the danger would not be against the manifest weight of the evidence.

{¶52}  According, we find Appellant's convictions for murder and felonious assault were not against the manifest weight of the evidence.

{¶53}  Appellant's sole assignment of error is overruled.

{¶54}  The judgment of the Richland County Court of Common Pleas is affirmed. Costs to Appellant.


By: Hoffman, J.

Baldwin, P.J. and

Popham, J. concur